UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MARY COLLINS, | ) | CASE NO. 4:07CV1661 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE PETER C. ECONOMUS |
| | ) | |
| MICHAEL J. ASTRUE, | ) | Magistrate Judge George J. Limbert |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |
| | ) | **OF MAGISTRATE JUDGE** |

Mary Collins ("Plaintiff") seeks judicial review of the final decision of Michael J. Astrue ("Defendant"), Commissioner of the Social Security Administration ("SSA"), denying Plaintiff's application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). ECF Dkt. #1 at 1-2. Plaintiff asserts: (1) that the Administrative Law Judge ("ALJ") erred in finding that Plaintiff retains the residual functional capacity ("RFC") to conduct sedentary work; (2) that the ALJ did not fully and fairly develop the record; and (3) that evidence submitted after the ALJ's decision warrants remand under sentence six of 42 U.S.C. §405(g). ECF Dkt. #15 at 1. For the following reasons, the undersigned RECOMMENDS that the Court DENY Plaintiff's appeal and AFFIRM the ALJ's decision.

I.      **PROCEDURAL HISTORY**

On December 8, 2003, Plaintiff filed applications for DIB and SSI. Tr. at 65-67, 540-42. The SSA denied her claims initially and on reconsideration. *Id*. at 39–49 543-52. Plaintiff then requested a hearing before an ALJ. *Id*. at 50-51.

On May 17, 2006, an ALJ conducted a hearing where he received testimony from Plaintiff and Alina Kurtanich, a vocational expert. Tr. at 583-99. Plaintiff appeared without counsel. *Id*. at 585. On September 26, 2006, the ALJ issued a decision finding that Plaintiff was not disabled. *Id*. at 15-27. On May 22, 2007, the Appeals Council denied Plaintiff's request for review. *Id*. at 7-14.

On June 5, 2007, Plaintiff filed the instant suit.  ECF Dkt.  #1.  On November 20, 2007, Plaintiff filed a brief on the merits.  ECF Dkt. #15.  On December 20, 2007, Defendant filed a brief on the merits.  ECF Dkt. # 16.

## II.  SYNOPSIS OF THE FACTS

### A.  Personal and Vocational Background

Plaintiff is approximately 37 years old.  *See* Tr. at 65.  She lives with her daughter and her granddaughter.  *Id*. at 121.  She spends her days caring for her cats, reading, watching television, and resting.  *Id*. at 122, 125.  Her daughter helps her by carrying cat food and litter and by helping shave her legs.  *Id*. at 122-23.

Plaintiff completed high school and a year and a half of college, but did not graduate.  Tr. at 588.

Plaintiff last worked by providing daycare services out of her home in November 2003.  Tr. at 589.

Plaintiff smokes.  Tr. at 184.

### B.  Medical Evidence Available at or Before the Administrative Hearing

On December 17, 2003, Plaintiff saw a physician (name illegible on provided document) for a disability evaluation, and the physician noted chest pain, Wolf-Parkinson-White syndrome ("WPW"), osteoarthritis in the knees and ankles, and obesity.  Tr. at 153.

The same day, Clement Cahall, M.D. examined Plaintiff for a disability physical.  Tr. at 175-76.  Dr. Cahall noted that he had never met Plaintiff before.  *Id*.  Plaintiff reported to Dr. Cahall that she had multiple medical problems, but she had not sought medical care due to a lack of insurance.  *Id*.  She stated that she believed she had a heart attack about one year earlier when she experienced crushing chest pain and was unable to get out of bed for about a week.  *Id*.  Dr. Cahall noted that Plaintiff was diagnosed with WPW at age 11.  *Id*.  Plaintiff complained of significant pain down the back of her left leg both with exercise and at rest.  *Id*.   Dr. Cahall observed that Plaintiff's morbid obesity and knee arthritis prevented her from standing for long periods of time.  *Id*.  Plaintiff complained of a shortness of breath even with minimal exertion.  *Id*.  She also complained of stress

incontinence and nocturia.[1]  *Id.*

Upon physical examination, Dr. Cahall recorded Plaintiff at five feet, ten inches tall and 299 pounds.  Tr. at 175.  He observed bilateral crepitus in the knees and ankles, but no effusion or joint laxity.  *Id.*  He concluded that Plaintiff "has potentially multiple medical problems including coronary artery disease, morbid obesity, significant [degenerative joint disease] in the knees, neurogenic vs. vascular claudication of the [left] lower extremity and [shortness of breath] which has been undiagnosed."  *Id.* at 176.  Dr. Cahall stated that "[p]erhaps with better medical care and follow-up she will be able to be an employable person."  *Id.*  He opined that she would require an EKG, exercise stress test and echocardiogram, pulmonary function tests, a weight loss program, smoking cessation, and medical or surgical therapy for her knees.  *Id.*

On January 6, 2006, Plaintiff presented to the St. Elizabeth Health Center Emergency Room with complaints of "mild pressurelike chest discomfort for a few days prior to arrival."  Tr. at 184. Jahardan Tallam, M.D., examined Plaintiff and noted normal findings, diagnosed chest pain, and admitted her in stable condition.  *Id.* at 184-85.  Plaintiff's discharge summary indicates that a 2-dimensional echocardiogram did not show any wall motion abnormality.  *Id.* at 195.  A pulmonary function test showed restrictive lung disease, mostly secondary to obesity.  *Id.*  Plaintiff's forced vital capacity was 67%, which was indicative of a significant restriction.  *Id.*  The majority of Plaintiff's symptoms were thought to be the result of deconditioning.  *Id.* at 196.  Plaintiff's exercise stress test was negative, but her nuclear stress test showed a reversible defect in the anterior chest, anterolateral wall.  *Id.*  Plaintiff declined a heart catheterization  *Id.*  Plaintiff was prescribed Lopressor 25 mg twice a day, aspirin 81 mg once a day, lisinopril 10 mg once a day, and nitroglycerin tablets as needed for chest pain.  *Id.*  She was advised to follow up with outpatient catheterization and to attend a follow-up appointment with Dr. Naddour.  *Id.*  She was also advised

---

[1] Nocturia is a "[p]urposeful urination at night, after waking from sleep; typically caused by increased nocturnal secretion of urine resulting from failure of suppression of urine production during recumbency or incomplete emptying of the bladder because of obstructive lesions in the lower urinary tract or detrusor instability."  Stedman's Medical Dictionary, (27th Ed. 2000).

to stop smoking, to diet, and to exercise.  *Id*. at 197.

On February 12, 2004, Plaintiff saw Dr. Cahall for a follow-up from her hospitalization and he suspected coronary artery disease without active angina.  Tr. at 345.  He recommended that she have a catheterization as soon as possible.  *Id*.  On February 19, 2004, Plaintiff returned for a follow-up visit.  *Id*. at 344.  In addition to coronary artery disease, Dr. Cahall suspected diabetes.  *Id*.  He recommended that she start a diet and stop smoking.  *Id*.

On March 9, 2004, Plaintiff saw Paul Wright, M.D..  Tr. at 350.  Dr. Wright convinced Plaintiff to undergo catheterization, and he prescribed Norvasc.  *Id*.  On March 30, 2004, Dr. Wright performed the catheterization and concluded that: Plaintiff's ejection fraction was 60%, she had no mitral regurgitation, she had no aortic stenosis or regurgitation, and her coronary angiography revealed mild ectasia with a dominant circumflex system.  *Id*. at 358-59.

On April 3, 2004, Plaintiff saw Dr. Cahall.  Tr. at 343.  She complained of intermittent bouts of substernal chest pain of a short stabbing nature.  *Id.*  Dr. Cahall determined that coronary artery disease was absent.  *Id*.

On April 5, 2004, Mark Wilson, M.D. conducted a disability evaluation.  Tr. at 372-74.  Plaintiff complained of chest pain dating back to March of 2003.  *Id*. at 372.  She stated that her chest pain had been resolved, but she continued to have low energy.  *Id*.  She also claimed that she would still experience chest pain with exertion.  *Id*.  Plaintiff indicated that her chest pain had been less frequent with blood pressure medication, and she had used nitroglycerin on only one occasion.  *Id*.  Plaintiff reported that she had cut her tobacco usage from two packs of cigarettes per day to one pack per day.  *Id*. at 373.  She reported that when she stood for 20 minutes, she experienced lower back pain, pain in both knees, and swelling in her ankles.  *Id*.  She reported intermittent pain radiation down the back of her left leg.  *Id*.

Following a physical exam, Dr. Wilson concluded Plaintiff had: intermittent tachycardia, most likely secondary to WPW; chest pain suspicious of angina; obesity; intermittent shortness of breath, most likely related to her obesity, COPD, and coronary artery disease; bilateral ankle pain; bilateral knee pain, most likely secondary to her obesity; intermittent long standing low back pain with left lower extremity radicular symptoms.  Tr. at 374.  Dr. Wilson ruled out early degenerative

joint disease in the knees and in the lower back.  *Id*.  He opined that she could walk on level ground at her own pace, but she was limited by her chest pain and shortness of breath.  *Id*.  He stated that Plaintiff's ability to lift and carry would be problematic until her cardiovascular status had been defined.[2]  *Id*.  Dr. Wilson opined that Plaintiff was able to sit, to handle objects, and to hear and understand others.  *Id*.

On April 15, 2004, at the state's request, Rebecca Neiger, M.D. completed an RFC assessment form based upon a review of Plaintiff's medical records.  Tr. at 382-87.  Dr. Neiger concluded that Plaintiff was able to lift 20 pounds occasionally and 10 pounds frequently.  *Id*. at 384.  She found that Plaintiff could stand or walk for a total of at least 2 hours in an 8-hour workday and could sit for a total of 6 hours in an 8-hour workday.  *Id*.  Dr. Neiger concluded that Plaintiff could operate bilateral foot controls frequently, but not for a sustained period.  *Id*.  Dr. Neiger opined that Plaintiff should be restricted to occasional stooping, kneeling, crouching, crawling, and climbing of ramps and stairs.  *Id*. at 385.  She opined that Plaintiff should never be required to climb ladders, ropes, or scaffolds.  *Id*.  Dr. Neiger stated that Plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation.  *Id*. at 386.  On August 25, 2004, Maria Congbalay, M.D. affirmed Dr. Neiger's findings.  *Id*. at 387.

On May 6, 2004, Plaintiff saw Dr. Cahall because she was experiencing a high level of anxiety over her catheterization and chest pain when lying flat.  Tr. at 342.Dr. Cahall concluded that her chest pain most likely resulted from her anxiety.  *Id*.  He prescribed Zoloft to treat her anxiety and depression.  *Id*.

On May 26, 2004, Plaintiff returned for a follow-up examination with Dr. Cahall.  Tr. at 341.  Dr. Cahall noted that Plaintiff was doing "very well with Zoloft."  *Id*.  Dr. Cahall concluded that Plaintiff's hypertension was under "excellent control."  *Id*.  He concluded that her back pain was likely the result of muscle spasms caused from her obesity.  *Id*.  He recommended weight loss and possibly prescribing Meridia, but Plaintiff was unable to afford the medication.  *Id*.  Dr. Cahall

---

[2]  Plaintiff was scheduled to follow up with her physician regarding the results of a heart catheterization.  Tr. at 374.

stated that Zoloft was producing excellent results, and he continued the prescription.  *Id.*

On July 20, 2004, at the state's request, Claudia E. Johnson Brown, Ph.D. conducted a psychological evaluation.  Tr. at 398-405.  Dr. Johnson Brown noted that Plaintiff drove herself to the interview and had a current driver's license.  *Id.* at 399.  Plaintiff described her vocation and medical history to Dr. Brown.  *Id.*  Dr. Johnson Brown noted that Plaintiff was alert and oriented, times three.  *Id.* at 400.  She was able to recall her name, address, telephone number, social security number, and the past three presidents.  *Id.*  She identified Pittsburgh as the closest major city and identified a professional sports team that plays there.  *Id.*  She completed five steps of serial sevens before making an error.  *Id.*  She could add one and two digit numbers, divide, and count by fives up to 100.  *Id.*

Dr. Johnson Brown concluded that Plaintiff's immediate recall was moderately impaired because she was able to recall only one of three items after five minutes.  Tr. at 401.  Her recent memory was mildly impaired because she could recall details of only the last two meals she had eaten.  *Id.*  Her remote memory was mildly impaired because she was unable to recall the town in which she was raised, but she could recall her date and place of birth, some of the schools she had attended, and one of her elementary school teacher's names.  *Id.*

Dr. Johnson Brown noted Plaintiff's mood at moderately depressed and anxious.  Tr. at 401.  Her affect was flat and somewhat restricted.  *Id.*  Plaintiff reported feeling sad on a daily basis and experiencing crying spells one to two times a day.  *Id.*  Plaintiff reported suicidal thoughts in the past, but none at the time of the exam.  *Id.*

Plaintiff reported sleeping for an average of four hours a night.  Tr. at 401.  She reported that she used to bathe daily, but at the time of the interview, she bathed approximately once a week.  *Id.*  She also reported infrequent panic attacks.  *Id.* at 402.  She indicated that she felt uneasy in crowds because she experienced stress incontinence.  *Id.*  She also described her daily activities.  *Id.* at 403.  Plaintiff denied experiencing hallucinations.  *Id.* at 402.

Dr. Johnson Brown noted that Plaintiff's insight was good and that her judgment was marginally adequate for her gross safety needs.  Tr. at 402.

-6-

Based on her interview, Dr. Johnson Brown concluded that Plaintiff had the ability to understand and remember one-step instructions. Tr. at 403. She concluded that Plaintiff may have difficulty remembering multi-step tasks due to her moderate impairment in immediate recall. *Id*. She opined that Plaintiff had no difficulties getting along with others in the work setting. *Id*. at 404. She opined that Plaintiff did not have the ability to withstand the normal stressors of the work environment due to the stressors associated with her depression. *Id*.

Dr. Johnson Brown diagnosed major depressive disorder – single episode – severe without psychotic features and obsessive-compulsive disorder. Tr. at 404. She assigned Plaintiff a global assessment of functioning at 35. *Id*.

On August 23, 2004, Douglas Pawlarczyk, Ph.D. completed a psychiatric review technique form and a mental RFC form based upon a review of Plaintiff's records. Tr. at 406-421. Dr. Pawlarczyk determined that Plaintiff suffered from major depression, single episode, improved, but that the condition did not satisfy the diagnostic criteria set forth in Listing 12.04. *Id*. at 409. He also determined that Plaintiff suffered from anxiety as evidenced by obsessions or compulsions which were a source of marked stress. *Id*. at 411. He opined that Plaintiff had mild limitations in her activities of daily living and in her ability to maintain social functioning. *Id*. at 416. He concluded that Plaintiff was moderately limited in her ability to maintain concentration, persistence, or pace. *Id*. Dr. Pawlarczyk opined that Plaintiff had not experienced repeated episodes of decompensation with extended duration. *Id*. In evaluating Plaintiff's RFC, Dr. Pawlarczyk opined that she experienced moderate limitations in her abilities: to understand and remember detailed instructions; to carry out detailed instructions; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and to respond appropriately to changes in the work setting. *Id*. at 419-20. Dr. Pawlarczyk noted no other limitations. *Id*. He concluded that Plaintiff was not entirely credible because: her allegations of stress were inconsistent with her work history; she reported to her physician that the Zoloft was working well; and her medical records showed no indication of heart problems. *Id*. at 421.

On September 8, 2004, Dr. Cahall wrote a letter stating that Plaintiff's osteoarthritis, obesity, and chronic shortness of breath keep her from having a physically active job. Tr. at 501. Dr. Cahall also stated, however, that it was "not possible for [him] to say at [that] time that she is totally disabled and not able to be employed in any capacity." *Id.* He noted that she was also severely limited by her COPD, tobacco use, WPW (which was stable at the time), and stress incontinence (which was somewhat debilitating due to her inability to leave the house). *Id.*

On November 8, 2004, Plaintiff saw Sunil Parulkar, M.D. for her urinary incontinence. Tr. at 438. Plaintiff stated that she had stress incontinence for the past 10 years and had worn incontinence pads for the past 10 years. *Id.* She reported no urgency incontinence. *Id.* Plaintiff reported a nocturnal frequency of three to four times and a daytime frequency of once every half an hour to one hour. *Id.* Dr. Parulkar diagnosed stress urinary incontinence and ordered flexible cytoscopy and cystometric studies. *Id.* at 439.

On November 12, 2004, Plaintiff had x-rays showing an absence of bony or soft tissue abnormalities in both knees. Tr. at 485. On November 29, 2004, an MRI showed mild degeneration in Plaintiff's left knee. *Id.*

On January 12, 2005, Plaintiff returned to Dr. Cahall with complaints of urinary incontinence, anxiety, panic attacks, and left knee pain. Tr. at 494. Dr. Cahall instructed her to continue with the medications and to follow up with Koteswara Kaza, M.D.. *Id.*

On May 24, 2005, Plaintiff met with Amy Frampton, a licensed independent social worker in Dr. Kaza's office. Tr. at 446-58, 469. Frampton diagnosed Major Depression, Recurrent, and assigned a GAF of 55. *Id.* at 455.

On May 25, 2005, Plaintiff saw Dr. Parulkar for treatment of her urinary incontinence. Tr. at 435. Plaintiff's cystometric studies did not reveal a genuine stress incontinence. *Id.* Plaintiff reported that her nocturnal frequency had reduced significantly from 7-8 times per night to only 1-2 times. *Id.* She reported changing her incontinence pads 3-4 times during the day. *Id.* Dr. Parulkar noted that Plaintiff had not changed her lifestyle – she did not reduce her caffeinated beverage consumption, she has not stopped smoking, and she had not lost weight. *Id.* He provided Vesicare and asked her to return in four weeks. *Id.* He stated that she may need a sling procedure if the

-8-

medication did not work.  *Id*.

On June 3, 2005, Plaintiff saw Timothy Domer, D.O. for bilateral knee pain, with more severity in the left knee.  Tr. at 519.  Dr. Domer noted full, pain free, unrestricted range of motion in the knees.  *Id*.  He noted very mild crepitation with active and passive motion through the patellofemoral articulation.  *Id*.  He also noted tenderness in the popliteal fossa of the knee.  *Id*.  Dr. Domer noted a fluid collection on the posteromedial part of her knee joint posterior to the femoral condyles.  *Id*. at 520.  He diagnosed degenerative joint disease in both knees and a mass popliteal fossa of the left knee.  *Id*.  He ordered a bone scan due to her complaints of pain.  *Id*.  He also recommended physical therapy and a home exercise program.  *Id*.

On June 21, 2005, Plaintiff saw Dr. Kaza with complaints of mood swings.  Tr. at 466.  Dr. Kaza prescribed Zoloft, Lamictal, Klonopin, Ativan, and Anafranil.  *Id*.

On July 28, 2005, Plaintiff returned to Dr. Domer for a follow-up visit.  Tr. at 517.  After completing physical therapy, Plaintiff still reported knee pain.  *Id*.  Dr. Domer ordered an MRI and x-rays of the lumber spine.  *Id*.

On July 30, 2005, an MRI showed disc desiccation from L4-S1, moderate diffuse disc bulging at L4-L5, diffuse disc bulging at L5-S1, moderate spinal canal stenosis with mild right-sided foraminal stenosis at L4-L5, moderate spinal canal stenosis at L5-S1 and mild discogenic degenerative endplate changes at L4 and L5.  Tr. at 527-28.

On August 5, 2005, Plaintiff saw Dr. Cahall with complaints of intolerance to Zocor.  Tr. at 489.  She also complained that Darvocet no longer provided relief for back pain.  *Id*.  Dr. Cahall prescribed Lipitor and recommended an arthritis maintenance program.  *Id*.

On August 16, 2005, an x-ray of the lumbar spine showed the disc space at L4-L5 was moderately narrowed with moderate spurring.  Tr. at 482.  The L5-S1 space was slightly narrowed, and the rest of the intravertebral space was normal.  *Id*.  Dr. Domer determined that the x-rays showed degenerative arthritis.  *Id*. at 516.  He recommended physical therapy.  *Id*.

On August 23, 2005, Dr. Kaza noted that Plaintiff was doing better and increasing her level of activity and motivation.  Tr. at 460.

On September 16, 2005, Dr. Domer noted that cervical x-rays showed a normal cervical spine.  Tr. at 480.

On September 25, 2005, Dr. Kaza noted that Plaintiff's mood was stable, and her sleep and appetite were good.  Tr. at 445.  Further, she was not experiencing any side effects from her medications.  *Id*.

On September 30, 2005, Plaintiff reported for physical therapy for her back pain at East Liverpool City Hospital.  Tr. at 477.  The physical therapist noted decreased strength in both lower extremities.  *Id*.

On October 11, 2005, Dr. Parulkar noted that Plaintiff was tolerating Vesicare well and she had a "significant reduction in frequency and urgency of urination."  Tr. at 434.

That same day, Dr. Kaza noted that Plaintiff was sad about the approaching anniversary of her father's death.  Tr. at 443.  On November 6, 2005, Dr. Kaza documented continued feelings of depression.  *Id*. at 444.  He also noted that Plaintiff was not experiencing any side effects from the medications she was taking.  *Id*.  On November 8, 2005, Amy Frampton noted that Plaintiff was "doing fair."  *Id*. at 459.

On November 30, 2005, Plaintiff saw Dr. Domer who noted that Plaintiff had not been attending therapy.  He diagnosed hamstring tendinitis of the left knee and chronic thoracic sprain and strain.  *Id*.  He ordered therapy again.  *Id*.

On December 18, 2005, Dr. Parulkar again noted that Plaintiff was tolerating Vesicare well.  Tr. at 433.  She had a significant reduction in frequency and urgency of urination, but she had been experiencing recurrence of her symptoms and occasional frequent incontinence.  *Id*.

On February 16, 2006, Dr. Domer noted that Plaintiff had degenerative changes of the patellofemoral joint.  Tr. at 513.  He ordered injection therapy.  *Id*. at 514.

On March 7, 2006, Dr. Cahall noted that Plaintiff was tolerating Lipitor without complaints and her blood pressure was under good control.  Tr. at 507.  Plaintiff failed to lose any weight, and given her excessive body weight, Dr. Cahall opined that it would be very difficult for her to have a significant resolution of her back pain.  *Id*.  He noted that Plaintiff's diabetes, hypertension, and hypercholesterolemia were all under adequate control with medication.  *Id*.  He ordered an MRI of

her cervical spine.  *Id*.  Lastly, Dr. Cahall stated that Plaintiff would most likely need to lose 100 pounds in order to experience relief from her back pain.

On March 30, 2006, Dr. Domer noted that Plaintiff's knee pain did not affect her ambulatory capacity during the day.  Tr. at 512.  He stated that Plaintiff had radiographic changes of early arthritis and a clinical exam that was consistent with early arthritis.  *Id*.  Dr. Domer administered injection therapy, which Plaintiff tolerated well.  *Id*.

On May 15, 2006, Amy Frampton and Dr. Kaza drafted a letter stating that Plaintiff had been in their care for many years.  Tr. at 502.  They stated that, although she had been compliant with her medication regimen, she continued to experience symptoms of her Major Depressive Disorder and Obsessive Compulsive Disorder.  *Id*.  They opined that she would continue to require treatment in order to have any quality of life.  *Id*.  They concluded, "It is in our clinical opinion that this client is unable to work and hold viable employment."  *Id*.

### C. Testimonial Evidence

At the administrative hearing, Plaintiff waived her right to a representative.  Tr. at 585-87.  Plaintiff then testified that she was 45 years old, divorced, and living with her daughter and granddaughter.  *Id*. at 588.  She completed high school and a year and a half of college.  *Id*.  She testified that she was unable to work because, when she was running a daycare service out of her home, she began having chronic chest pains and was afraid that she would have a heart attack.  *Id*.

Plaintiff testified that her job did not require her to lift or carry things.  Tr. at 590.  She cooked the children small meals, such as Spaghetti-O's.  *Id*.  She said that she was able to sit and stand as needed during daycare.  *Id*.

Plaintiff testified that she is unable to get out of bed on some days and did not leave her room.  Tr. at 591.  On "good days" she will leave her room and go downstairs.  *Id*.  She cooks simple meals for herself such as sandwiches or soup, but she testified that there are times when she will go a couple of days without eating.  *Id*.  Plaintiff stated that her back and legs hurt too much  to do the laundry and household cleaning, so her daughter performs those chores.  *Id*.  Plaintiff stated that she is unable to shop for groceries and she does not visit with friends, but she does have a driver's license and drives herself to doctor's appointments about twice a month.  *Id*.

-11-

The ALJ questioned Plaintiff about her medications.  Tr. at 592.  Plaintiff testified that she takes Anafranil and Lamictal.  *Id*.  She takes Darvocet at least twice a day because her pain is excruciating.  *Id*.  She takes Clonopin for anxiety attacks.  *Id*. at 592-93.  She takes baby aspirin for her heat condition.  *Id*. at 593.  She takes Zoloft, Lipitor, Licinopril, Antivert, Ativan, Vesicare, and Pericolace.  *Id*.

Plaintiff claimed that her most severe pain was in her back and legs.  Tr. at 593.  To treat the pain, she rubs her muscles, using heating pads, and takes Darvocet.  *Id*. at 594.  She claimed that her back pain was constant, but Darvocet reduces the severity.  *Id*.  With regard to incontinence, Plaintiff claimed that, with medication, her nighttime frequency decreased from 7-8 times to 2-3 times at most.  *Id*.  She claimed that the medication did not help with stress incontinence and that her doctor said that her only option would be to have a sling put on her bladder.  *Id*.  She testified that her daytime frequency was about 18 times per day at an average of once every 20 minutes.  *Id*.

The ALJ then questioned Vocational Expert Alina Kurtanich ("VE").  Tr. at 596-598.  The VE classified Plaintiff's daycare experience as semi-skilled at a light exertional level.  *Id*. at 596.  The ALJ then posed three hypothetical questions for the VE.  *Id*. at 596-97.

In the first hypothetical, the ALJ asked the VE to assume an individual of Plaintiff's age, education, and work experience with the following restrictions: maximum lifting restricted to 20 pounds; repeated lifting limited to 10 pounds; standing limited to 2 hours in an 8-hour workday; sitting limited to 6 hours in an 8-hour workday; walking limited to 2 hours in an 8-hour workday; no requirements to climb ladders, ropes, or scaffolds; occasional stooping, kneeling, crawling, crouching, balancing, or climbing; pushing and pulling limited in the same manner as lifting and carrying; no exposure to dust, fumes, odors, gases, or poor ventilation; a low stress environment; and an ability to work at a slower pace.  Tr. at 596-97.  The VE opined that such a person could not return to Plaintiff's prior job.  *Id*. at 597.  She opined that such a person could work as a credit checker, which is an unskilled position performed at the sedentary level with 79,000 positions available in the national economy.  *Id*.  The VE also opined that such a person could work as a ticket checker, which is an unskilled position at the sedentary level, with over 100,000 positions available at the national level.  *Id*.  Lastly, the VE opined that such a person could work as a document

preparer, which is an unskilled position at the sedentary level, with over 200,000 positions available at the national level. *Id.*

In the second hypothetical, the ALJ asked the VE to assume the previous hypothetical with additional limitations. Tr. at 597. The ALJ asked the VE to assume someone limited to standing for 20 minutes per occurrence or to walk 20 minutes per occurrence, and a requirement for a sit/stand option at 20 minute intervals. *Id.* at 598. The VE opined that those restrictions would not change the vocational abilities of the hypothetical person. *Id.*

In the third hypothetical, the ALJ asked the VE to reduce the maximum lifting capacity to 10 pounds and to reduce the repeated maximum lifting capacity to 5 pounds. Tr. at 598. The ALJ asked the VE to assume a person who needed to have access to the restroom 12 or more times during the workday. *Id.* The VE opined that such a person could not perform substantial gainful activity. *Id.*

At the conclusion of the hearing, the ALJ asked Plaintiff if there was anything else she would like to address. Tr. at 598. Plaintiff stated that she disagreed with the VE's opinion that she was able to work as grocery checkout girl because she is not able to concentrate. *Id.* The ALJ then concluded the hearing. *Id.*

### D. Medical Evidence Submitted After the Administrative Hearing

On May 1, 2006, Dr. Parulkar noted that Plaintiff was on Vesicare and was tolerating it well. Tr. at 576. He noted a significant reduction in frequency and urgency of urination. *Id.* Again on October 3, 2006 and October 31, 2006, Dr. Parulkar noted significant reductions in frequency and urgency on Detrol LA. *Id.* at 572-73. Plaintiff submitted these reports following the administrative hearing.

On November 14, 2006, Dr. Kaza and Amy Frampton drafted a letter stating the Plaintiff has been in their care for treatment of bipolar disorder. Tr. at 557. They stated that she has not been able to work due to extreme symptoms of depression and anxiety. *Id.* They stated that she has severe medical issues and severe pain, she does not function in daily activities, she withdraws into her bedroom, and she will not leave her house for days at a time. *Id.* Plaintiff reported feelings of worthlessness. *Id.* They concluded that her condition could not be expected to improve to the level

-13-

required to secure and maintain employment.  *Id.*

## III.    STATEMENT OF THE LAW

### A.    Steps to Evaluate Entitlement to Social Security Benefits

An ALJ must proceed through the required sequential steps for evaluating entitlement to

disability insurance benefits.  These steps are:

1.    An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (§§20 C.F.R.  404.1520(b) and 416.920(b) (1992));

2.    An individual who does not have a "severe impairment" will not be found to be "disabled" (§§20 C.F.R.  404.1520(c) and 416.920(c) (1992));

3.    If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see §§20 C.F.R. 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (§§20 C.F.R.  404.1520(d) and 416.920(d) (1992));

4.    If an individual is capable of performing the kind of work he -or she has done in the past, a finding of "not disabled" must be made (§§20 C.F.R. 404.1520(e) and 416.920(e) (1992));

5.    If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (§§20 C.F.R.  404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden of going forward

with the evidence at the first four steps, and the Commissioner has the burden at Step Five to show

that alternate jobs in the economy are available to the claimant, considering her age, education, past

work experience and RFC.  *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

### B.    Standard of Review

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and

makes a determination of disability.  The Court's review of such a determination is limited in scope

by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any

fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  Therefore, the

Court is limited to determining whether substantial evidence supports the Commissioner's findings

-14-

and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990). The Court cannot reverse the ALJ's decision, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *Walters v. Commissioner of Social Security*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla of evidence, but less than a preponderance. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion. *Id.; Walters,* 127 F.3d 525, 532 (6th Cir. 1997). Substantiality is based upon the record taken as a whole. *Houston v. Secretary of Health and Human Servs.*, 736 F.2d 365 (6th Cir. 1984). Furthermore, in reviewing the ALJ's decision, deference is due to the ALJ's credibility determinations. *See Casey v. Secretary of Health and Human Services*, 987 F.2d 1230, 1234 (6th Cir. 1993). A reviewing court may not retry the case, resolve factual or evidentiary conflicts, or decide questions of credibility. *See Cutlip v. Secretary of Health and Human Services*, 25 F.3d 284, 286 (6th Cir. 1994).

### IV. ANALYSIS

#### A. The ALJ's finding that Plaintiff can perform work existing in significant numbers is supported by substantial evidence.

Plaintiff alleges that the ALJ's finding that she can perform work existing in significant numbers is not supported by substantial evidence because: (1) the ALJ failed to apply the Treating Source Rule; (2) the ALJ's RFC failed to accurately reflect Plaintiff's abilities; and (3) the ALJ failed to fully and fairly develop the record. ECF Dkt. #15 at 13-20.

##### (i) The ALJ's application of the Treating Source Rule

An ALJ must adhere to certain standards when reviewing medical evidence in support of a claim for social security. Most importantly, the ALJ must generally give greater deference to the opinions of the claimant's treating physicians than to those of non-treating physicians. SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir.2004). A presumption exists that the opinion of a treating physician is entitled to great deference. *Id*; *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007). Accordingly, if that presumption is not rebutted, the ALJ must afford controlling weight to the opinion of the treating physician if that

-15-

opinion regarding the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." *Wilson,* 378 F.3d at 544. "The determination of disability is [ultimately] the prerogative of the [Commissioner], not the treating physician." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) quoting *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir.1985). When an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors in determining the weight to give to that opinion: the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors. *Id.*

If an ALJ decides to discount or reject a treating physician opinion, he must provide "good reasons" for doing so. SSR 96-2p. The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* This allows a claimant to understand how her case is determined, especially when she knows that her treating physician has deemed her disabled and she may therefore " 'be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.' " *Wilson,* 378 F.3d at 544 quoting *Snell v. Apfel,* 177 F.3d 128, 134 (2nd Cir.1999). Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why he rejected or discounted the opinions and how those reasons affected the weight accorded the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243, citing *Wilson*, 378 F.3d at 544.

Plaintiff contends that the ALJ improperly discounted Dr. Kaza and Amy Frampton's opinions that she is unable to work and hold viable employment and that she would require ongoing treatment in order to have any quality of life. ECF Dkt. #15 at 15. Defendant contends that Dr. Kaza's opinions are not binding on the Commissioner as a matter of law, and Amy Frampton is not considered to be an acceptable medical source under 20C.F.R. §404.1513(a).

-16-

In the case at bar, Dr. Kaza's opinion (Tr. at 502) is not entitled to controlling weight because it is not *well-supported* by medically acceptable clinical and laboratory diagnostic techniques and it is inconsistent with other substantial evidence in the case record. Dr. Kaza states that he has an extensive treating relationship with Plaintiff; however, his treatment notes are "minimal" by Plaintiff's own admission. *See* ECF Dkt. #15 at 15. Upon review of Dr. Kaza's treatment notes, the undersigned concludes that insufficient records exist to establish a basis for the opinion in acceptable clinical techniques. The notes provide minimal detail of Plaintiff's condition and the treatment/diagnostic techniques that Dr. Kaza employed . Tr. at 440-69. Further, as the ALJ noted, the records that do exist are inconsistent with Dr. Kaza's disability conclusions. For instance, Dr. Kaza's most recent progress notes indicate that Plaintiff's mood was stable, her sleep and appetite were good, she had no side effects from medication, she had no suicidal feelings and hallucinations, and her insight and judgment were fair. *See Id*. at 22; 440-69. On August 23, 2005, Amy Frampton also noted that Plaintiff had made "good progress;" on November 8, 2005, Frampton noted that Plaintiff had a "good response;" and on October 11, 2005, Frampton reported Plaintiff's good response to interventions/progress toward goals and objectives. *Id*. at 443, 459, 460.

Turning to the substance of Dr. Kaza's opinions, the undersigned notes that Dr. Kaza's statement is conclusory insofar as it states that Plaintiff is unable to work and hold viable employment. That determination rests with the Commissioner. A physician's statement that a claimant is "disabled" or "unable to work" is not considered a medical opinion, but is an opinion on an issue that is reserved to the Commissioner and is not entitled to any special deference. 20 C.F.R. §§ 404-1527(e)(1); 416.927(e)(1). Further, Dr. Kaza bases his opinion on the finding that Plaintiff "still has symptoms of her illness" and "[s]he will need to continue to have treatment in order to have any quality of life." Tr. at 502. Not every claimant with Major Depressive Disorder and OCD is disabled simply because she exhibits symptoms or requires treatment. To reach such a conclusion, as Dr. Kaza did, would completely avoid the question as to whether the claimant has the ability to manage her condition and to function in the workplace. Dr. Kaza's statement is an excellent example of the pitfalls of such an analysis. Dr. Kaza's statement says nothing about the severity of Plaintiff's symptoms or the effectiveness of the treatment. Therefore, his statement falls

-17-

short of establishing restrictions on Plaintiff's ability to function in the workplace.

In light of the foregoing, the undersigned finds that Dr. Kaza and Amy Frampton's opinions are not entitled to controlling weight under the treating physician rule, and even if they are, the ALJ's decision to discount the opinions is supported by substantial evidence.

> **(ii)     The ALJ's finding with regard to Plaintiff's RFC is supported by substantial evidence.**

Plaintiff contends that the ALJ's RFC "failed in two ways."  ECF Dkt. #15 at 17.  She first claims that the ALJ failed to accommodate the limitations imposed by her mental impairments.  *Id*. Plaintiff reasons that the RFC does not encompass the limitations found by the treating, examining, or reviewing psychologists of record.  *Id*.  Plaintiff contends that the ALJ does not account for an inability to withstand work stress, to hold viable employment, or to perform only in settings with regular expectations and few changes.  *Id*.

Secondly, Plaintiff contends that the ALJ failed to account for limitations imposed by Plaintiff's urinary incontinence.  ECF Dkt. #15 at 17.  Plaintiff reasons that the ALJ did not make a finding as to how severe Plaintiff's incontinence is – instead, his RFC did not account for any limitation regarding the frequency of rest breaks.  *Id*. at 18.  Defendant contends that the ALJ did not rule out incontinence.  ECF Dkt. #16 at 15.  Defendant further contends that the ALJ found Plaintiff's incontinence to be less severe than alleged.  *Id*.

Turning first to Plaintiff's allegations regarding her mental RFC, the undersigned finds Plaintiff's arguments not to be compelling.  First, the ALJ concluded that Dr. Johnson Brown's conclusion that Plaintiff is not able to withstand the stressors of the work environment was inconsistent with evidence in the record.  Tr. at 20.  The ALJ reasoned that Plaintiff's impairments improved, as evidenced by most of her GAF's being rated at 55.  *Id*. at 21.  A GAF of 55 is indicative of *moderate* symptoms or *moderate* difficulty in social, occupational, or school functioning. Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) at 34 (emphasis added).  Therefore, the ALJ's conclusion that Dr. Johnson Brown's opinion was not supported by other evidence in the record is well-founded.  Tr. at 20.  Plaintiff's regularly recorded GAF is not indicative of a work preclusive condition.  *Id*. at 21.

The Sixth Circuit has held:

> The [Global Assessment Functioning] score is a subjective determination that represents the clinician's judgment of the individual's overall level of functioning.... [A] score *may have* little or no bearing on the subject's social and occupational functioning.... [W]e are not aware of any statutory, regulatory, or other authority *requiring* the ALJ to put stock in a [GAF] score in the first place.  Moreover, the Commissioner has declined to endorse the [GAF] score for use in the Social Security and [SSI] disability programs, and has indicated that [GAF] scores have no direct correlation to the severity requirements of the mental disorders listings....... Any failure to reference [GAF] scores or to compare different scores attributed to the same subject, without more, *does not require reversal.*

*DeBoard v. Comm'r of Soc. Sec.,* 211 F. App'x, 411, 415-16 (6th Cir.2006) (citations and quotations omitted)(emphasis added).  That holding, however, does not necessarily preclude an ALJ from relying upon a claimant's GAF.

The ALJ went on to address records from treatment with Dr. Kaza showing improvements in Plaintiff's condition following Dr. Johnson Brown's exam.  Tr. at 21-22.  As discussed above, Dr. Kaza's most recent progress notes indicate that Plaintiff's mood was stable, her sleep and appetite were good, she had no side effects from medication, she had no suicidal feelings and hallucinations, and her insight and judgment were fair.  *See Id.* at 22; 440-69.  On August 23, 2005, Amy Frampton noted that Plaintiff had made "good progress;" on November 8, 2005, Frampton noted a "good response;" and on October 11, 2005, Frampton reported Plaintiff's good response to interventions/progress toward goals and objectives.  *Id.* at 443, 459, 460.  These subsequent improvements provide a basis for discounting a Dr. Johnson Brown's opinion.  *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994) (holding that an ALJ could discount the opinion of an examining psychologist in favor of a non-examining psychologist where the examining doctor did not have access to all medical records).

The undersigned finds that the ALJ's discussion of Plaintiff's subsequent improvement and GAF ratings was based upon substantial evidence to discount Dr. Johnson Brown's opinion.  Therefore, the ALJ did not err when he omitted an inability to withstand stress from Plaintiff's RFC.

Furthermore, the ALJ did not err in omitting an "inability to hold viable employment" from the RFC.  Plaintiff contends that the ALJ was required to incorporate this restriction based upon Dr. Kaza's opinion.  ECF Dkt. #15 at 17, n. 9.  However, as discussed in Section IV(A)(i) above, the

ALJ's decision to discount Dr. Kaza's opinion was supported by substantial evidence.

Lastly, Plaintiff contends that the ALJ's mental RFC determination does not accommodate Dr. Pawlarczyk's determination that she is capable of carrying out routine work and that she is motivated to perform in settings with regular expectations and few changes.  ECF Dkt. #15 at 17.  Plaintiff offers virtually no explanation for her conclusion.

The ALJ found that Plaintiff was limited to simple, routine, repetitive work.  Tr. at 22.  The term "routine" is defined as "of, relating to, or being in accordance with established procedure." Merriam-Webster's Online Dictionary.   The term "regular" is defined as "recurring, attending, or functioning at fixed, uniform, or normal intervals."  *Id*.  The undersigned interprets "routine, repetitive work" to be synonymous with "regular expectations and few changes."  Consequently, the undersigned fails to see how "simple, routine, repetitive work" is inconsistent with regular expectations and few changes.

Turning to the issue of Plaintiff's physical RFC, the undersigned also finds substantial evidence supporting the ALJ's decision.  Plaintiff contends that the ALJ did not determine how severe Plaintiff's urinary incontinence impairment was.  ECF Dkt. #15 at 18.  Plaintiff's conclusion is unfounded because the ALJ stated that "claimant's incontinence is not as severe as alleged . . . [her] nocturnal frequency had significantly reduced to about 1 to 2 times as opposed to 7 to 8.  However, she still had incontinence and used pads to change 3 to 4 times per day."  Tr. at 24.  The ALJ determined that Plaintiff has the RFC to perform sedentary work, with some limitations.  While the ALJ did not specify break intervals for Plaintiff, normal breaks are implicit in the class of sedentary work.  In the context of sitting requirements, Social Security Ruling 96-9p states "In order to perform a full range of sedentary work, an individual must be able to remain in a seated position for approximately 6 hours of an 8-hour workday, with a morning break, a lunch period, and an afternoon break at approximately 2-hour intervals."  SSR 96-9p at 6.  Applying the morning break, the lunch period, and the afternoon break to the case at bar, Plaintiff would have 3 breaks during the workday under the ALJ's RFC.  Additionally, Plaintiff would have an opportunity to change her incontinence pads prior to and following work.  Further, if Plaintiff needs to change her incontinence pads 3-4 times during the day, it is fair to presume that not all of these occurrences will

arise during the 8-hour workday.  Therefore, the ALJ's RFC, with implicit normal breaks, sufficiently accounts for Plaintiff's need to change her incontinence pads 3-4 times per day.

### (iii)    The ALJ fully and fairly developed the record.

Plaintiff contends that the ALJ failed to fully and fairly develop the record, and this failure resulted in prejudice to Plaintiff.  ECF Dkt. #15 at 19.

In *Johnson v. Secretary of H.H.S.*, 794 F.2d 1106, 1111 (6th Cir. 1986), the court held that an Administrative Law Judge must fully and fairly develop the administrative record.   In *Born v. Secretary of H.H.S.*, 923 F.2d 1168, 1172 (6th Cir. 1990), the court held that the brevity of a hearing alone could not establish that an ALJ failed to fully develop the record on behalf of a pro se claimant particularly where the claimant failed to indicate what additional evidence should have been brought out.  In this case, the ALJ informed Plaintiff of her right to counsel, he offered her additional time to obtain counsel, he allowed Plaintiff to testify, he examined a vocational expert, and he asked Plaintiff if she had any additional evidence to submit.  *See* Tr. at 585-87, 598.

The undersigned finds Plaintiff's claim that the ALJ failed to scrupulously and conscientiously probe into the relevant facts to be meritless.  As summarized above, the ALJ questioned Plaintiff about her urinary incontinence.  *See infra* §2(C), Tr. at 594-95.  He questioned the vocational expert about the effects of incontinence.  Tr. at 598.  Lastly, although the ALJ did not call a medical expert to testify, he had discretion in determining whether one was necessary.  *See* 20C.F.R. § 404.1527(f)(2)(iii).  " '[F]ull inquiry' does not require a consultative examination at government expense unless the record establishes that such an examination is necessary to enable the administrative law judge to make the disability decision."  *Landsaw v. Secretary of H.H.S.*, 803 F.2d 211, 214 (6th Cir. 1986).  In this case, the ALJ had complete medical records documenting Plaintiff's complaints of incontinence and her improvements.  There is no indication that it was necessary to seek an opinion from a non-examining medical expert.  Plaintiff contends that her urologist provided only early quantification of the problem, and offered nothing concrete or recent enough to refute Plaintiff's claims.  That argument is inconsistent with Plaintiff's testimony at the hearing.  Plaintiff testified that, with medication, her nighttime frequency decreased from 7-8 times to 2-3 times at most.  Tr. at 594-95.  This is almost exactly what she reported to Dr. Parulkar on

May 25, 2005 – almost a year before the administrative hearing.  *See* Tr. at 435.  Therefore, the undersigned fails to see how Plaintiff can assert that her urologist provided "only early quantification of the problem" when she testified at the administrative hearing to the same limitations she reported to her urologist approximately one year earlier.  The fact that Plaintiff's condition remained unchanged for nearly a year confirms the conclusion that Dr. Parulkar's notes were complete, and the ALJ did not abuse his discretion in deciding not to call a medical expert to testify.

Plaintiff also contends that the ALJ erred in failing to call a medical expert to testify about her mental impairments.  ECF Dkt. #15 at 20.  Such a claim is unfounded where, as here, the administrative record includes treatment records from a treating psychologist and consultative evaluations from an examining psychologist and a reviewing psychologist.  It cannot be said that an expert was required in this case to make a disability determination.  The ALJ had access to the treatment notes Plaintiff provided, and those notes showed an improvement in her condition.  Further, the fact that Dr. Kaza submitted a conclusory opinion prior to the hearing did not require the ALJ to call a medical expert.  As discussed above in Section IV(A)(ii), the ALJ appropriately analyzed all the psychologists' opinions and determined that they were inconsistent with Plaintiff's improvements.

For the foregoing reasons, the undersigned finds that the ALJ did conduct a full and fair hearing.

**B.      A Sentence Six Remand is not appropriate in this case.**

Plaintiff contends that her case should be remanded pursuant to sentence six of 42 U.S.C. §405(g).  ECF Dkt. #15 at 20.  In a sentence-six remand, the court "does not rule in any way as to the correctness of the administrative determination." *Faucher v. Secretary of H.S.S.*, 17 F.3d 171, 175 (6th Cir. 1994) citing *Melkonyan v. Sullivan*, 501 U.S. 89, 97-98 (1991).  "Rather, the court remands because new evidence has come to light that was not available to the claimant at the time of the administrative proceeding and that evidence might have changed the outcome of the prior proceeding." *Id.*; *See also Sullivan v. Finkelstein*, 496 U.S. 617,  626 (1990).   Thus, a remand pursuant to sentence six of § 405(g) is a pre-judgment remand for consideration of new and material

-22-

evidence that for good cause was not previously presented to the Secretary.  *Faucher*, 17 F.3d at 174-75.

Turning first to post-hearing evidence of incontinence (Tr. 572-76), Plaintiff has not met her burden.  She alleges that the evidence is new because it did not exist at the time of the hearing.  ECF Dkt. #15 at 20-21.  The May 1, 2006 record predates the May 17, 2006 administrative hearing, and accordingly does not form a basis for remand absent good cause.  *See* Tr. at 576.  Plaintiff claims good cause based only on the facts that the records did not exist at the time of the hearing – a claim that is simply not true as it relates to the May 1, 2006 record.  ECF Dkt. #15 at 21.  Further, Plaintiff has failed to establish materiality.  Plaintiff contends that the evidence is material because it shows that Dr. Parulkar deemed continued treatment necessary, including a change in medication due to constipation.  "Evidence of a subsequent deterioration or change in condition after the administrative hearing is deemed immaterial."  *Jones v. Commissioner of Social Sec.*, 336 F.3d 469, 478 (6th Cir. 2003) quoting *Wyatt v. Secretary of Health & Human Servs.*, 974 F.2d 680, 685 (6th Cir.1992).  Therefore, Plaintiff's constipation is immaterial.  Lastly, Plaintiff states that Dr. Parulkar made "rote repetitions of the notes, 'significant reduction in frequency and urge incontinence,' " and had the ALJ considered this evidence, he may have reached a different outcome.  ECF Dkt. #15 at 21.  These "rote repetitions" are not material because they are simply repetitions of the same evidence available to the ALJ before the administrative hearing.  Furthermore, it appears that these statements weaken Plaintiff's case.  Her treating physician was continuing to note improvement with medication, even though continued treatment was necessary.  *See* Tr. at 572-75.  Based upon that evidence, the undersigned finds that a sentence six remand is not appropriate.

Plaintiff also contends that a written opinion from her treating counselor and treating psychiatrist offered the clearest, most thorough explanation to support their opinion of Plaintiff's psychological impairments.  ECF Dkt. #15 at 21 referring to Tr. at 557.  Plaintiff contends that this opinion is new because it was written on November 14, 2006.  Plaintiff's argument is not persuasive because there is no apparent reason that the opinion Dr. Kaza articulated on November 14, 2006 could not have been obtained at an earlier time, and Plaintiff does not show good cause for failure to do so.  In fact, Dr Kaza wrote an opinion on May 15, 2006, which the ALJ did consider.  It would

pose a tremendous burden on both the judicial and administrative systems to afford a sentence six remand for a claimant based upon an opinion of a treating physician that could have been obtained earlier, particularly where that physician submitted an opinion prior to the administrative hearing. Essentially every claimant could guarantee a remand by submitting a second opinion following an administrative hearing.  Further, the undersigned agrees with Defendant that the November 14, 2006 report is not material because it is simply a reiteration of Plaintiff's symptoms and Dr. Kaza's earlier opinion.  Therefore, the undersigned is not persuaded by Plaintiff's assertion that there is a reasonable probability that the ALJ would have reached a different conclusion based upon Dr. Kaza's November 14, 2006 opinion.

## V.       CONCLUSION

For the foregoing reasons, the undersigned recommends that the Court DENY Plaintiff's appeal on all grounds and AFFIRM the ALJ's decision.


DATE: May 6, 2008                                      *s/ George J. Limbert*
                                                       GEORGE J. LIMBERT
                                                       UNITED STATES MAGISTRATE JUDGE


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of service of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).